**Malcolm SAULSBURY,
Petitioner-Appellant,**

v.

**UNITED STATES of America,
Respondent-Appellee.**

**No. 78–1801.**

United States Court of Appeals,
Fifth Circuit.

March 20, 1979.

---

Michael Tobin, Staff Counsel for Inmates, Robert N. Udashen, Texas Dept. of Corrections, Huntsville, Tex., for petitioner-appellant.

Kenneth J. Mighell, U. S. Atty., Gerhard Kleinschmidt, Asst. U. S. Atty., Fort Worth, Tex., for respondent-appellee.

Before JONES, CLARK and GEE, Circuit Judges.

CHARLES CLARK, Circuit Judge:

The appellant is a federal parole violator seeking to have the time spent serving a state conviction for crimes committed while on parole credited to his previously imposed federal sentence. He alleges that the statements of his federal parole officer induced his plea of guilty on the intervening state charges and that the officer's subsequent actions amounted to an impermissible refusal of his custody when it was tendered by the state. Resolution of his claims requires an interpretation of this court's prior holding in *Lebosky v. Saxbe,* 508 F.2d 1047 (5th Cir. 1975).

I.

Malcolm Saulsbury was convicted in 1969 in the United States District Court for the Northern District of Texas for transportation of marijuana, and sentenced to serve eight years. He was first paroled in 1972 but that parole was revoked about seven months later. On November 15, 1974, he was again paroled. At the time of his second parole, 909 days remained to be served on his federal sentence. While on parole the second time, Saulsbury was arrested and in May 1975 he was indicted by the State of Texas on drug-related charges. Saulsbury's federal parole officer, Glenn Wortham, requested that a federal parole violator warrant be issued because of Saulsbury's state charges, and on June 13, 1975, the United States Parole Commission issued such a warrant. In transmitting the warrant to the United States Marshal, the Parole Commission attached a cover letter which contained the following instruction:

> Please hold warrant in abeyance. If pending charge results in no conviction, advise Board for further instructions. However, should subject change plea to guilty or be found guilty, place a detainer and assume custody if and when released.

Pursuant to these instructions by the Parole Commission, the Marshal did not execute the warrant. The legal effect of this action was that Saulsbury's federal sentence ceased to run while the warrant was in abeyance.

On August 27, 1975, Saulsbury entered pleas of guilty or no contest on all state counts. During the period leading up to Saulsbury's guilty pleas, Saulsbury and his attorney had several contacts with Glenn Wortham concerning the disposition which the Parole Commission would make of Saulsbury's case. Saulsbury contends that Wortham represented that the Parole Commission would provide that Saulsbury's outstanding federal time would run concurrently with the service of any state sentence. Saulsbury asserts that Wortham led him to believe that the federal government would assume custody of Saulsbury to finish out his federal sentence while his state sentence was running, or alternatively, that the Parole Commission would allow Saulsbury's sentence to run and expire while Saulsbury was in state custody. Wortham's representations, Saulsbury claims, were an inducement to his state guilty pleas.

Wortham's recollection of these events is that he either told Saulsbury no more than what disposition he would recommend to the Parole Commission or that he was merely predicting what course he thought the Commission would take. Wortham maintains that he did not participate in the state plea bargaining sessions either directly or indirectly, and that he made no promise or representations as to what the Parole Commission would actually do.

On the date Saulsbury pled guilt in state court, he asked Judge James Zimmerman, of the Criminal District Court of Dallas County, Texas, if his state sentence would run concurrently with his federal sentence.[1] Judge Zimmerman stated that his state sentence would run concurrently with his federal sentence and, in an order handwritten on the trial docket sheet, directed the Dallas County Sheriff to deliver Saulsbury to the United States Marshal. Soon after the sentencing, however, Wortham contacted the clerk of Judge Zimmerman's court and informed the clerk that the federal sentence "couldn't be served concurrently."[2] On September 2, 1975, Judge Zimmerman voided his prior order and directed that Saulsbury be turned over to the Texas Department of Corrections. Saulsbury then began serving his state time in the custody of Texas. The detainer was lodged against Saulsbury with Texas prison officials, asking Texas to hold Saulsbury for the federal government upon his release by the state.

Saulsbury filed a state petition for habeas corpus in Judge Zimmerman's court, arguing that his "plea-bargain" had not been honored. In denying state habeas relief, Judge Zimmerman stated that "The Court has personal knowledge of the fact that the plea bargain was kept, but that Federal authorities either refused or failed to take the Petitioner into custody following his State convictions." The judge then stated that if any relief were available to Saulsbury, it must be sought in federal court.

Saulsbury then brought the present action in the Northern District of Texas, which has been characterized alternatively as a petition for mandamus or habeas corpus. At the time that Saulsbury's petition

1. Saulsbury was sentenced to terms of 10 years on two of the state counts and 12 years on three of the state counts, all to run concurrently.

2. Wortham did not literally state to the clerk of the Texas court that federal authorities would refuse to accept Saulsbury if he were tendered to the federal marshal by the state. It is not clear that Wortham was aware that Judge Zimmerman had ordered Saulsbury turned over to the United States Marshal. Wortham did know, however, that Judge Zimmerman intended that Saulsbury's state and federal time run simultaneously. Wortham's communication to the state clerk was aimed at resolving "the confusion as to the sentence." The district court believed that Wortham simply meant to inform the state court that "you can't keep him in the State custody and cause the Federal Government to give credit." Seen in that light, Wortham's actions were nothing more than a statement to the state court that Judge Zimmerman could not order the federal government to grant Saulsbury federal credit if Saulsbury remained in state custody. The district court further found, however, that the state court *understood* Wortham's actions as a representation that the federal government would refuse to accept custody of Saulsbury if he were tendered. The court thus treated the transaction as an actual offer of custody followed by an actual refusal to accept it, and we treat it similarly.

was heard before the district court, he was still serving his state sentence in state custody. By February 13, 1979, the date of oral argument on this appeal, Saulsbury had been released on parole from state custody and taken into federal custody to begin serving the remainder of his federal sentence.[3] The Parole Commission issued a presumptive reparole date of May 21, 1980, conditioned on Saulsbury's good conduct while in federal confinement.

Saulsbury seeks to have the time that he spent serving his state convictions credited to the 909 days which remained on his federal sentence when he was originally paroled on that sentence. If that credit were applied, Saulsbury would be entitled to immediate release from federal custody.

Saulsbury relies on two aspects of *Lebosky v. Saxbe,* 508 F.2d 1047 (5th Cir. 1975), to support his claim for relief. *Lebosky* stated that the federal government may not induce a state plea bargain by representations that previously imposed federal time and newly imposed state time will be concurrently served, and then take actions which frustrate the state's provision for concurrency. 508 F.2d at 1050. The first prong of *Lebosky* was grounded in the rule set forth in *Santobello v. New York,* 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971), that promises made by the government in a plea bargain must be kept. The second prong of *Lebosky* is that the federal government may not, on the one hand, lodge a detainer with the state to hold a prisoner for federal custody at the termination of his state sentence and, on the other hand, frustrate the intentions of the state sentencing authority by declining to accept custody of the prisoner when it is made available by the state. *Id.* at 1049.

The district court refused Saulsbury all relief. The court found that the evidence offered by Saulsbury failed to support his allegations that the federal government through Parole Officer Wortham had en-

gaged in any promises or representations inducing Saulsbury's state plea bargain. The court further held that the subsequent decisions in *Moody v. Daggett,* 429 U.S. 78, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976), and *Sanchez v. Riggsby,* 556 F.2d 1310 (5th Cir. 1976), explained *Lebosky* to the extent of making the federal government's refusal to take immediate custody of Saulsbury permissible. We agree with the district court's factual and legal analysis of Saulsbury's claims, and affirm the court's denial of relief.

## II.

Santobello v. New York, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971), established what has now become a cornerstone principle in the law governing plea bargains: government promises, once made, must be honored. *Lebosky* applied the *Santobello* rule in the context of a tripartite arrangement between the federal government, a state, and a prisoner wanted by both sovereigns. Lebosky had been a prisoner in the Atlanta federal penitentiary. He escaped from federal prison and while a fugitive was arrested by Louisiana state authorities and charged with armed robbery. A federal detainer was lodged with Louisiana on the escape charge. Lebosky entered a guilty plea on his Louisiana state charge and was sentenced to 15 years to run "concurrent with any other sentence." Rather then send Lebosky to the state penitentiary, Louisiana then held him in a local jail for federal custody. The federal government never accepted such custody. Lebosky was briefly brought to Atlanta for a federal trial on the escape charge, but he was immediately returned to Louisiana following the escape conviction and began serving time in the Louisiana state penitentiary, still with the federal detainer lodged against him. Because the federal government did not take custody of Lebosky when that custody was tendered, Lebosky faced the prospect of serving 15 years on his state

---

**3.** Saulsbury's parole release by the State of Texas was pursuant to normal Texas parole procedures and apparently was in no way intended as a mitigation of his state sentence

designed to accommodate Judge Zimmerman's original intention for concurrency of the state and federal sentences.

sentence followed by an additional 15 years on his remaining federal sentence.

Lebosky's claim, which was dismissed by the district court, asserted that the office of the U.S. Attorney in New Orleans had knowledge of, and perhaps participated in, an overall arrangement of which the Louisiana plea bargain was a part, and another part of which was an understanding that the federal authorities would promptly take custody. Relying on *Santobello*, this court held that Lebosky's allegations were broad enough to permit proof which would entitle him to relief, saying:

> No plea bargain in a federal case has taken place, but if our national government has induced a state plea bargain in a state case by representations that previously imposed federal time and newly imposed state time will be concurrently served, the policy of *Santobello* would require at least that the federal government not frustrate the state's provision for concurrency.

508 F.2d at 1050.[4]

There is ample support in the record in Saulsbury's case to support the district court's conclusion that the federal government did not induce Saulsbury's state plea bargain by representations that his previously imposed federal time would run concurrently with his state sentence. Saulsbury's attorney, Barclay, testified that no one from the federal government told him what disposition would be made of Saulsbury's case. The district court pointedly asked Barclay: "Is there any conduct on the part of any representative of the Federal Government that you can point to me that [shows that the assumption that Saulsbury would be taken into federal custody] was induced by the Federal Government; somebody said something or didn't say something?" Barclay's response was that

his understanding was grounded in his own past experience and not in any representations by any agent of the federal government.

Mary Larson Banner, a person who worked in a bail bondsman's office and who dealt with both Saulsbury and his parole officer, Wortham, was similarly unable to state on examination that Saulsbury's understandings as to concurrency were based on representations made by any official of the federal government. The thrust of Ms. Banner's testimony was that Wortham had told her what could happen to Saulsbury and what he would recommend to the Parole Commission, but that Wortham never offered anything more than his own opinions and predictions.

Both the testimony of Saulsbury and the testimony of Wortham contain equivocation and hedging as to exactly what Wortham told Saulsbury. It appears that Saulsbury did have a subjective expectation that his federal time and state time would run concurrently. A letter from Wortham to Saulsbury supports Saulsbury's contention that statements made by Wortham contributed to Saulsbury's belief. However, neither Saulsbury nor his lawyer, Barclay, testified that Wortham or any other federal official ever encouraged Saulsbury to plead guilty to the state charge, and Saulsbury testified that when he was before Judge Zimmerman he never asserted that he had been promised concurrency by the federal government.

Wortham, who was new at the job when he handled Saulsbury's case, admitted that he was confused as to the procedures of the Parole Commission. It appears that Wortham may have mistakenly thought either that holding Saulsbury's warrant in abeyance had the effect of allowing his federal time to run, or that it was routine policy of

---

4. The federal authority involved in Lebosky's case was the United States Attorney's Office in New Orleans, and not the United State Parole Commission. In Part III of this opinion we hold that the "second prong" of *Lebosky* involving the refusal of custody of a prisoner on whom a federal detainer has been lodged, applies only when a prior violation of *Santobello* is involved. Under our interpretation of the second prong of *Lebosky*, it is not material that Saulsbury's claim involved the Parole Commission rather than the U.S. Attorney's Office. We note, however, that the *Moody* and *Sanchez* decisions, discussed in Part III, would, if anything, require greater deference toward a federal decision not to assume custody when that decision originates with the Parole Commission.

the Parole Commission to allow for the concurrent running of time in situations such as Saulsbury's. But Wortham steadfastly asserted that he never did anything other than set out the possibilities for Saulsbury; he testified that he did not tell Saulsbury what the ultimate outcome of his case would be because he "didn't know what the outcome was going to be."

The Parole Commission itself treated Saulsbury according to its standard procedures and policies. The Commission policy in cases where a federal parolee is arrested and convicted on state charges is to stop the running of the federal sentence and to impose the unserved federal time at the conclusion of the state sentence. It is normal for the Commission to implement this policy by issuing a warrant but holding it in abeyance pending state release, with a federal detainer lodged against the prisoner while in state custody. The issuance of the warrant against Saulsbury took place on June 13, 1975, over two months prior to Saulsbury's state guilty pleas. The intention of the Parole Commission was officially declared as of that date and would have been easily discernable by Saulsbury or his lawyer had they made a routine check of the records of the Commission or the United States Marshal.

Whatever the nature of Wortham's talks with Saulsbury, he had no authority, real or apparent, to countermand the orders of the Parole Commission. The district court's conclusions that Wortham did not induce Saulsbury's plea with promises or representations is substantiated by the testimony of several witnesses, and is the most credible reconstruction of the events leading to the plea. Although we cannot condone Wortham's evident carelessness in offering opinions and predictions to Saulsbury, the record fully supports the district court's conclusion that his conduct did not rise to the level of a violation of *Santobello*.

### III.

*Lebosky* states:

The federal government may not, on the one hand, by a detainer have Louisiana hold appellant for federal custody at the termination of his state sentence and, on the other hand, frustrate the intent of the Louisiana sentencing authority by declining to accept the custody made available to it by the detainer.

508 F.2d at 1049. It characterizes the prisoner's plight in such a situation as being "whipsawed between the federal government's right to take him into custody and its refusal to take him into custody." *Id.* *Lebosky* left unclear whether the prohibition or the "whipsawing" of a prisoner is a corollary to its central holding on the obligation of the federal government under *Santobello* to honor representations that induce a state guilty plea, or whether, as Saulsbury asserts, it is an independently imposed prohibition on the simultaneous lodging of a detainer and refusal to take custody, regardless of a *Santobello* violation. However, the Supreme Court's decision in *Moody v. Dagget*, 429 U.S. 78, 97 S.Ct. 274, 50 L.Ed.2d 236 (1976), requires that the second prong of *Lebosky* be limited to situations where an agent of the federal government has violated *Santobello*.

*Moody* held that a federal parolee, who committed federal crimes while a parolee and was then sentenced to begin serving time on those subsequent crimes, was not entitled to an immediate parole revocation hearing where a parole violator warrant had been issued and lodged with the institution of his confinement as a detainer but not executed. *Moody* noted that "It is now firm Commission policy that unless 'substantial mitigating circumstances' are shown, the parole violator term of a parolee convicted of crime is to run consecutively to the sentence imposed for the subsequent offense." 97 S.Ct. at 277–78. The Court held that the Commission was under no constitutional obligation to hold a hearing on whether the sentences should run concurrently or consecutively until after the intervening sentence has been completed and the prisoner "is taken into custody as a

parole violator by execution of the warrant."[5] *Id.* at 280.

This court's decision in *Sanchez v. Riggsby*, 556 F.2d 1310 (5th Cir. 1977), applied *Moody* to hold that the discretion of the Parole Commission to defer its determination on whether to grant consecutive or concurrent time cannot be overridden by a provision for concurrency made by the judge who fixes the parolee's intervening sentence:

> Since, as noted in *Moody*, the Parole Commission has the discretion to grant concurrent sentences on a retroactive basis, we conclude that Sanchez was not entitled to an immediate parole revocation hearing. The 'concurrent' provision of the second sentence is not frustrated by this conclusion since the district court was aware at the time the sentence was imposed that the original sentence might or might not be reimposed.

556 F.2d at 1312.

■ The decision of whether a federal parole violator will actually serve a second sentence concurrently with the remainder of the sentence paroled is a matter exclusively within the province of the Parole Commission. *Zerbst v. Kidwell*, 304 U.S. 359, 362–63, 58 S.Ct. 872, 874, 82 L.Ed. 1399 (1938). The second sentencing judge, state or federal,[6] may not interfere with that discretion. The discretion is essential to the authority of the Parole Commission:

> Unless a parole violator can be required to serve some time in prison in addition to that imposed for an offense committed while on parole, he not only escapes punishment for the unexpired portion of his original sentence, but the disciplinary power of the Board will be practically nullified.

*Zerbst v. Kidwell, supra,* 304 U.S. at 303, 58 S.Ct. at 874. The Parole Commission's disposition of the parolee's original sentence is properly to be made in light of the society's strong interests in having parole conditions honored. As *Moody* acknowledged, the Commission's policy of deferring the determination until the intervening sentence is completed likewise vindicates a strong societal interest in having parole decisions based on the most informed prediction possible of a prisoner's ability to return to society without committing further antisocial behavior. 97 S.Ct. at 279. Such an informed decision can only be made by the Parole Commission, and it cannot be prematurely forced upon the Commission by the sentencing authority on the intermediate conviction.

■ In the absence of representations to a prisoner that induce a state guilty plea, there is no bar to the simultaneous lodging of a federal detainer and a refusal to accept custody of a prisoner until his state confinement has been completed. Our limitation of *Lebosky* to situations where a *Santobello* violation has occurred is required by the principles set forth in *Moody* and *Sanchez.* It is possible, however, to read *Lebosky* as indicating this resolution. *Lebosky* acknowledged "the principle that a prisoner may not question an arrangement between sovereigns concerning the order in which sentences are to be executed," 508 F.2d at 1050, citing this court's decision in *Chunn v. Clark*, 451 F.2d 1005 (5th Cir. 1971). In *Chunn* the court stated:

> It is well-established that a prisoner has no standing to contest an agreement between two sovereigns concerning the

---

5. Normally, the fact that a revocation decision is delayed until completion of the intervening sentence does not mean that the prisoner's sentences will necessarily run consecutively. "[E]ven after completion of the [intervening] sentences the Commission retains full discretion to dismiss the warrant or decide, after hearing, that [the] petitioner's parole need not be revoked." *Moody, supra,* 97 S.Ct. at 279. Of course, in Saulsbury's case we now know the Commission has determined not to set Saulsbury free.

6. Both *Moody* and *Sanchez* involved a federal parolee convicted of another federal offense. Other circuits have extended *Moody* to federal parolees convicted of a state crime. *Shelton v. Taylor*, 550 F.2d 98 (2d Cir. 1977); *Hicks v. United States Board of Paroles and Pardons*, 550 F.2d 401 (8th Cir. 1977); *Mack v. McCune*, 551 F.2d 251 (10th Cir. 1977); *Head v. United States Board of Parole*, 553 F.2d 22 (7th Cir. 1977).

temporary exchange of custody of the prisoner on a writ of habeas corpus ad prosequendum, or their agreement as to the order of his prosecution and execution of sentences. *Dorrough v. Texas*, 440 F.2d 1063 (5th Cir. 1971); *Nelson v. United States*, 406 F.2d 1322 (5th Cir. 1969); *Montos v. Smith*, 406 F.2d 1243 (5th Cir. 1969).

451 F.2d at 1006. *Lebosky* distinguished *Chunn* by stating that its rule does not apply when "there have been representations upon which the state relied, inducing the imposition of a state sentence whose concurrency provision cannot be implemented because the federal sovereign will not fulfill its representations." 508 F.2d at 1050. This reasoning indicates that *Lebosky* predicated its "whipsaw" prohibition on the existence of federal representations which if dishonored would violate *Santobello*. Indeed, its distinction of *Chunn* explicitly invokes "the policy of *Santobello*" as the linchpin of the court's holding. Neither the state nor the prisoner may force the federal government to accept custody of a prisoner owing federal time unless the federal government has implicated itself directly or indirectly in a state plea bargaining process to such an extent that it would violate its *Santobello* obligation if it refused to honor its part of a tripartite arrangement.

## IV.

Unless the United States has somehow induced a state guilty plea by making a representation as to concurrency that would fall within the proscriptions of *Santobello*, a parole violator has no right to serve his sentences concurrently and may not protest when the federal government will not take him into custody until his intervening state sentence is served. Since the district court found that Saulsbury's state pleas were not induced by dishonored representations violative of *Santobello*, the petitioner is not entitled to any relief.

AFFIRMED.